## Quiñones, Demandante y Apelada, *v.* Sucesión Pérez Villamil, Demandada y Apelante.

Apelación procedente de la Corte de Distrito de San Juan, Primer Distrito, en pleito sobre cobro de dinero.

### No. 2539.—Resuelto en noviembre 22, 1923.

Prueba— Documentos— Primera Copia— Segunda Copia— Nuevo Juicio. — La corte sentenciadora admitió como prueba la copia certificada de una opinión de la Corte Suprema, la cual contenía lo que parecía ser una copia literal de los procedimientos habidos en el año 1873 debidamente certificados por el Secretario del Juzgado Municipal, insistiendo los apelantes en que la copia certificada de la opinión de la Corte Suprema no era admisible como prueba de los procedimientos seguidos en 1873. *Se resolvió:* que tales irregularidades de procedimiento no deben favorecerse y generalmente el hecho de insistirse con éxito en la corte inferior en la admisión de segundas copias, cuando las primeras pueden fácilmente obtenerse, justificaría una revocación; pero, dentro de las circunstancias de este caso en particular el no haber manifestado la corte inferior, al admitir el documento como prueba de lo que realmente había fallado y resuelto la Corte Suprema, que no sería considerado con ningún otro fin, no constituye por sí una razón suficiente para ordenar un nuevo juicio.

Id.—Id.—Acto de Conciliación—Prescripción de la Acción—Convenio Perfeccionado.—La presente causa de acción del demandante descansa principalmente en un acto de conciliación al cual se llegó como resultado de los procedimientos establecidos en el año 1885 y que se alega fueron ratificados en otros procedimientos en 1903. La corte inferior admitió como prueba una copia de este acto de conciliación y los apelantes alegan haberse cometido error en esta actuación, fundados en que con arreglo al artículo 477 de la antigua Ley de Enjuiciamiento Civil no procede ninguna acción basada en tal acto de conciliación a menos que no se presente la demanda dentro de los dos años siguientes. *Se resolvió:* que dicho artículo 477 hacía referencia a procedimientos en los cuales no se había llegado a ningún convenio, pero no tiene ninguna aplicación a una acción para compeler al cumplimiento de una obligación contraída en un acto de conciliación al cual se llegó de tal modo.

Intereses Compuestos—Ratificación de Obligación Anterior Nula.—La petición que hace el demandante para que se le devuelvan los dos mil pesos con los intereses convenidos sobre dicha suma al tipo de seis y nueve por ciento, reconocida como justa pero impugnada como prematura por el demandado, no implica una obligación de pagar intereses compuestos cuando no había un convenio válido preexistente al efecto. La suma que había de pagarse era aquella que se debiese como consecuencia de la liquidación final, y bajo la ley que regula el contrato original no podía comprender intereses compuestos.

Los hechos están expresados en la opinión.

Abogados de la apelante: *Sres. E. Acuña* y *Texidor & de la Haba.*

Abogados de la apelada: *Sres. J. Guzmán Benítez y B. Pagán.*

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

En la Corte de Distrito de San Juan, Distrito Primero, obtuvo la demandante sentencia a su favor condenando a la demandada a entregar, dentro del término de treinta días, a dicha demandante diez y seis vacas y sus crías desde principio del año 1911, y al pago, dentro del término de noventa días, de la suma de 56,025 pesos y 98 centavos, o su equivalente en moneda americana, más los intereses de dicho capital al 9 por ciento anual desde el 1°. de diciembre de 1915, capitalizándolo todos los años, hasta el completo de la deuda, y pago de las costas.

La apelante no hace un señalamiento de errores por separado sino que de cuando en cuando, en el curso de su alegato, que contiene sesenta páginas, somete ocho señalamientos legales específicos en los cuales se funda para solicitar la revocación de la sentencia apelada.

El primer fundamento alegado es que la corte incurrió en error al admitir como prueba una certificación de la opinión y sentencia en el caso de *Pérez Villamil* v. *Romano,* 19 D. P. R. 875.

La copia certificada a que se acaba de hacer referencia fué ofrecida para probar la segunda, tercera y cuarta alegaciones de la demanda, las cuales son como sigue:

"Segundo.—Ramón Pérez Villamil era propietario, de estado soltero y residía habitualmente en Río Grande en el año 1868. Dicho Ramón Pérez Villamil tenía alquilada a la demandante, como cocinera y al mismo tiempo vivía con ella en concubinato, habiendo engendrado en esas relaciones tres hijos naturales que más tarde fueron reconocidos como tales y declarados sus herederos forzosos por sentencia que dictó esta Corte de Distrito en 15 de enero de 1912, confirmada en apelación por la del Tribunal Supremo de Puerto Rico de 27 de junio de 1913. Inmediatamente después, Angel, Adelina y Plácida Pérez Villamil y Quiñones vendieron a los

demandados viuda e hijos legítimos de Ramón Pérez Villamil, todos sus derechos y acciones a la herencia de éste quedando los adquirentes subrogados en todos los derechos y obligaciones que les pertenecían como tales hijos naturales reconocidos.

"Tercero.—Debido a la ilimitada confianza que por virtud de las alegadas relaciones existía entre la demandante y Ramón Pérez Villamil, la primera entregó al segundo en calidad de préstamo, sin resguardo alguno, la cantidad de diez mil pesetas españolas o sean dos mil pesos de dicha moneda que la demandante había ganado en el sorteo de la lotería provincial de Puerto Rico, celebrado el día 23 de junio de 1868 por haber resultado premiado el billete número tres mil ochenta y uno que le pertenecía; y dicho préstamo se verificó con la condición de que los dos mil pesos prestados devengarían el interés del seis por ciento anual, no habiéndose fijado plazo para devolución de dicha suma, lo que la demandante no creyó necesario por vivir ambos en concubinato bajo el mismo techo, y porque Pérez Villamil mantenía a Ángel, Adelina y Plácida, los tres hijos que ambos habían procreado.

"Cuarto.—En la misma época y fecha de 1868 la demandante había adquirido, con los ahorros del producto de su trabajo, tres vacas paridas y una yegua con su cría, las que entregó a partir utilidades, a su amante, el referido Ramón Pérez Villamil, y éste puso a partir ganancia dicho ganado en una finca que expresamente compró con ese objeto."

Lo que representa ser una copia literal de los autos de un procedimiento llevado a cabo en noviembre de 1873, debidamente certificada por el Secretario de la corte municipal, estaba comprendida en la opinión de esta corte que fué ofrecida para probar las anteriores alegaciones y a la cual ya se ha hecho referencia como reportada en la página 875 del tomo 19 de las Decisiones de Puerto Rico. En el presente caso no es de ninguna importancia, excepto en lo que pueda servir de ayuda en la interpretación de las cuestiones promovidas ahora por los apelantes o servir para indicar en una forma general, los primitivos sucesos que han dado lugar a los posteriores acontecimientos que constituyen el verdadero fundamento de la presente controversia:

Insisten los apelantes en que la copia certificada expedida por el secretario de esta corte no era admisible como prueba de los procedimientos que tuvieron lugar en el año 1873 ante el Juez de Paz de Río Grande. Para los fines de esta opinión puede darse por admitida la corrección de este criterio como una manifestación abstracta y técnica de la Ley de Evidencia. Pero la copia fué claramente admisible para probar el resultado del pleito anterior, si era pertinente a la cuestión aquí envuelta, y en cuanto a esto no se ha promovido ninguna cuestión. La sentencia de esta corte simplemente confirmaba la apelada, y la opinión era pertinente tanto para fines de identificación de la sentencia así referida como con el objeto de acreditar la verdadera naturaleza y alcance de las cuestiones resueltas.

La primitiva causa de acción, según aparecía del procedimiento habido en el año 1873, quedó luego confundida en un acto de conciliación que fué consumado en el año 1885; y para los fines del presente caso el incidente anterior era un factor de poca importancia excepto según ya se ha indicado como un medio de explicación de los acontecimientos posteriores.

El único perjuicio que ni siquiera remotamente ha sido sugerido en el alegato es que por razón de la admisión de esta copia la demandada se vió privada de la oportunidad de "compulsar el documento de que se trata, y de hacer las correspondientes objeciones." Pero la apelante no explica, ni tampoco podemos nosotros concebir, qué oportunidad mejor hubiera podido presentarse para cotejo ofreciendo una primera copia certificada por el secretario de la corte municipal en vez del mismo documento hecho parte de la opinión de esta corte. Asimismo, también si es que los demandados quieren decir que fueron privados de la oportunidad de examinar el récord original, esa objeción sería igualmente aplicable a la admisión de una primera copia cer-

tificada por el guardián legal de tal original, siendo además dicha objeción claramente insostenible.

De todos modos la opinión de esta corte indica que los autos originales del Juzgado de Río Grande, así como una copia debidamente certificada de dichos autos, habían sido elevados a esta corte con los autos para un cotejo de las firmas que los demandados alegaban eran fraudulentas, habiéndose declarado tanto por este tribunal como por la corte inferior que las mismas eran auténticas. De manera que en el presente caso no solamente estaba el original fácilmente al alcance de todas las partes interesadas, sino que los demandados mismos tenían conocimiento íntimo de todos los particulares contenidos en él y como es de presumirse estaban lo suficientemente preparados para llamar la atención acerca de cualquier incongruencia o discrepancia material entre tal original y su copia contenida en la opinión que fué admitida como prueba por el juez sentenciador.

Tales irregularidades en la práctica no deben ser favorecidas y generalmente el insistir con éxito en la corte inferior en la admisión de copias secundarias cuando copias primarias pueden tan fácilmente ser obtenidas, podría justificar una revocación. Dentro de las circunstancias de este caso en particular, sin embargo, estamos persuadidos de que el dejar la corte inferior, al admitir el documento como prueba de lo que realmente había sido fijado y resuelto por esta corte, de expresar que no sería considerado con ningún otro fin, no es por sí solo razón suficiente para ordenar la celebración de un nuevo juicio.

La presente causa de acción de la demandante, como ya se ha dicho, se funda principalmente en un acto de conciliación al cual se llegó como resultado de los procedimientos judiciales instituídos en el año 1885 y que se alega fueron ratificados durante la tramitación de otro procedimiento en 1903.

La corte inferior estimó el *exhibit* de este acto de conci-

liación de tal importancia, que fué insertado enteramente y discutido con alguna amplitud en una acabada y bien formulada opinión. Un conocimiento más íntimo de ese *exhibit* que el que resultaría de una exposición de su significación y efecto general, puede ayudar para llegar a un mejor entendimiento de la verdedera relación de las cuestiones que se trataban de promover por los apelantes y simplificar así nuestra misma discusión y resolución de estas cuestiones. Dicho *exhibit* es como sigue:

"En el pueblo de Río Grande a los veinte y cinco días del mes de abril de mil ochocientos ochenta y cinco, ante el Sr. juez suplente don Timoteo González por inhibición legal del propietario con motivo de ser sobrino carnal del demandado, comparecieron de una parte como demandante la vecina Telesfora Quiñones, mayor de edad, de estado soltera, de oficio doméstico, acompañada de su hombre bueno don José Quiñones Correa, y de la otra don Ramón Pérez Villamil, también vecino, comerciante, soltero, y mayor de edad, acompañado de su hombre bueno don Abelardo Rivera y Correa, y habiendo presentado las partes sus respectivas cédulas personales de vecindad, que les fueron devueltas dijo la actora: que reproduce su demanda, reclamándole a su demandado don Ramón Pérez Villamil las mensualidades de diez pesos correspondientes a los meses de enero, febrero y marzo, que venía obligado a entregarle para la manutención de sus hijos nombrados Angel, Adelina y Plácida, cuya obligación de entrega le fué impuesta por sentencia dictada en el juicio que celebró la demandante con el demandado el día cuatro de noviembre del año mil ochocientos setenta y tres en el Juzgado de Paz de este pueblo, ante el Sr. Juez don Santos Jiménez.—Que por separado de la reclamación indicada amplía su petición a cinco vacas y una yegua con la mitad de sus gananciales tenidos hasta hoy, más la entrega de dos mil pesos moneda española con sus intereses de seis por ciento anual, que convino pagarle su demandado, desde el día primero de julio del año de mil ochocientos sesenta y ocho en que lo recibió sin que por ahora tenga que significar otra cosa.—El demandado contestó: que en cumplimiento de la sentencia dictada en el juicio a que se ha referido su demandante, ha venido entregándole para la alimentación de sus hijos, diez pesos todos los meses, tres mudas de ropa cada trimestre y su calzado correspondiente; pero

como aquellos son ya mayores de edad, casados y con hijos, y por tanto, emancipados y fuera de la *patria potestad,* creyó razonable suspender las mensualidades antes indicadas, y no entregar en lo adelante cantidad alguna por tales conceptos, a menos que se lo ordene alguna autoridad judicial.—Que en cuanto al ganado y dinero a que se ha referido su demandante, interesa a su decoro personal siquiera sea en atención al puesto oficial que siempre ha ocupado y ocupa en este pueblo, explicar con algunos pormenores todo ello, para que el Sr. Juez, y las demás personas presentes, puedan juzgar su proceder con entera exactitud.—Su demandante Telesfora Quiñones, vivió en casa del que expone como ama de llave por espacio de largos años.—Con los ahorros que hacía llegó a adquirir en distintas fechas cinco vacas y una yegua, con tres crías, cuyos animales daba las ganancias a pequeños propietarios que en definitiva dábanle malas cuentas.—En el año de mil ochocientos sesenta y nueve, el que declara, compró al padre Valajuly doscientas veinte y seis cuerdas de terreno de vega, y como hasta cierto punto, estaba y está obligado a velar no tan sólo por los intereses de su demandante, sino hasta por su salud y bienestar, siquiera sea en consideración a las muchas atenciones y cuidados que le prodigó en los largos años que fué su ama de llave, lo primero que hizo fué, tomar a partir utilidades el ganado de su demandante y soltarlo en su propiedad.—Las operaciones de venta, cambios y demás, que desde entonces lleva hechas, constan en una libreta especial que de exprofeso tiene entre sus demás libros, marcada con el número dos, para no confundir la cuenta de su demandante con las demás personas que tiene negocio.—Respecto de los dos mil pesos, éstos proceden del premio de un billete que su demandante compró número tres mil ochenta y uno, de la lotería que se juega en el país, correspondiente al sorteo celebrado el día veinte y tres de junio del año de mil ochocientos sesenta y ocho desde cuya fecha tiene el declarante esa cantidad al interés del seis por ciento anual, y así consta en un documento extrajudicial que debe de conservar su demandante, dado por el que declara, en el año mil ochocientos setenta y dos, si mal no recuerda.—Significo por último, que en el juicio celebrado en cuatro de noviembre del año mil ochocientos setenta y tres, pretendió la demandante al igual que hoy que el que declara le entregara el ganado e importe del billete con sus utilidades, y se negó a efectuarlo como se niega ahora, porque tiene la seguridad de que si lo

hiciera, dada la bondad de alma de su demandante y la pasión extremada que siente por su hijo mayor nombrado Angel, joven lleno de vicios, tenorio y jugador de fama que tiene la gran habilidad de saber dominar a su demandante de una manera admirable y a su capricho, bien pronto le derrocharía ese capitalito, y el que declara, obligado nuevamente como lo está, a velar por la salud y bienestar de su antigua y buena ama de llaves, ha evitado siempre y evitará por todos los medios que estén a su alcance, que por su citado hijo se mermen los bienes de su demandante, los cuales aunque le pese a aquél y a las demás personas que le rodean, el que declara lo seguirá adelantando a fin de que cuando ella esté en edad avanzada que le impida trabajar, pueda vivir descansada con las rentas que le produzca y en definitiva dejarle algo a sus hijos, como es el deber de toda buena madre, sin que tenga más nada que significar sobre los extremos comprendidos en la boleta de la demanda que en su contra ha establecido la señora Telesfora Quiñones.— En este estado el señor juez exhortó a los hombres buenos, para que vieran de hacer lo que les fuera posible, para que las partes llegaran a un acuerdo y evitar pleitos siempre enojosos, y después de las observaciones que mutuamente se hicieron la demandante hubó de manifestar.—Que impulsada no sólo por el afecto que le guarda a su demandado, padre de sus tres hijos llamados Angel, Avelina y Plácida, sino también por las consideraciones hechas por su hombre bueno señor Quiñones Correa, y las demás personas que intervienen en este acto, aceptaba desde luego que su demandado continuara adelantándole su capitalito en igual forma que hasta hoy, y por un término que su demandado creyera conveniente para ambos, pero con la condición de que el día último del presente mes deberá practicar una liquidación de los intereses devengados hasta ese día para acumularlos a los dos mil pesos de capital principal, y por el total que resulte deberá abonarle a su cuenta desde el día primero del entrante mes hasta el día de la liquidación general o plazo de vencimiento que el señor Villamil designe, el nueve por ciento anual capitalizado todos los años.—Y el demandado expresó: Que está conforme con las pretensiones indicadas por su demandante Telesfora Quiñones, y hará la liquidación, capitalización y abonos respectivos al nueve por ciento anual desde el día primero de mayo del corriente año.—Y para la liquidación general de cuentas, tanto el ganado vacuno como del caballar, al igual que el de los dos mil pesos moneda española, e intereses de igual moneda,

señala como plazo para efectuarla, el de dos meses antes de marcharse para España su país natal, a donde tiene que retirarse definitivamente dentro de breve tiempo por prescripción facultativa, a causa de estar constantemente enfermo del estómago, sin que hasta hoy haya podido conseguir una curación completa del mal que le aqueja.—Y siendo lógico · y razonable que para ese día le dé a su demandante el oportuno aviso, se compromete desde luego a efectuarlo, para que esta señora, acompañada de persona idónea y de notario que sea de su agrado, se apersone en el lugar que al efecto le indicará, a fin de practicar de acuerdo la liquidación general de todo, entrega de la suma que resulte a favor de su demandante, previa carta de pago que ésta otorgará, en el acto de recibir su importe.—Y siendo conforme la demandante por lo ·manifestado por su demandado, se ratificaron ambos en todo lo pactado.  Por virtud de lo cual el señor juez dió por terminado el acto mandando se libren certificaciones a · la parte que la pida ordenando a la demandada reintegre el papel dejado de usar con las costas de este juicio.  Leída esta acta la hallaron conforme los concurrentes firmándola el que supo junto con el señor juez y los hombres buenos ante mí de que certifico:—(firmado)  Timoteo Gonzáles.—Siguen las firmas.—(firmado)  R. Villamil.—José Quiñoñes.—Abelardo Rivera.—Juan R. Casanovas.—Diliga.—En veinte y cinco de abril, corriente año, agrego a este juicio tres pliegos de papel de reintegro, por el dejado de usar en el mismo, de veinte centavos, serie 0004568, 0004569, 0004605.—Certifico:—(firmado) Casanovas. —Otra: En la propia fecha, expido certificación de este acto al demandado don Ramón Pérez Villamil, certifico:—''Julio—enmendado —la—entre líneas—vale—i—entre líneas—vale.—(firmado)  Casanovas.—Yo, Teodosio F. Pereira, Secretario de la Corte Municipal de Carolina, P. R., Certifico: Que la precedente es una copia fiel y exacta del original de su contenido obrante en el archivo de esta Secretaría a que me remito.  Y para entregar a don Carlos Quiñones vecino de Río Grande, la libro y firmo en Carolina, P. R., a 11 de septiembre de 1915.—(Firmado) Teodosio F. Pereira, Secretario de la Corte Municipal.''

Los apelantes sostienen que la corte inferior incurrió en error al admitir como prueba la certificación de este *exhibit.* Insisten ellos en que de acuerdo con el artículo 477 de la Ley de Enjuiciamiento Civil antigua no procedería ninguna·

acción basada en tal acto de conciliación a menos que fuera entablada dentro de los dos años siguientes, y por tanto, a falta de alguna demostración de haberse cumplido con este requisito, la prueba documental del acto de conciliación en cuestión era inadmisible.

Pero la cláusula en la cual se ha insistido debe ser interpretada en relación con su contexto, tanto en la misma sección como en otras contenidas en el título denominado "De los actos de conciliación." El artículo 459, en tanto es pertinente, los 461 y 475 al 478, inclusives, prescriben lo siguiente:

"Art. 459.—Antes de promover un juicio declarativo, deberá intentarse la conciliación ante el juez municipal competente.

"Exceptúanse:

*          *          *          *          *          *          *

"6.—Los juicios declarativos que se promuevan para reclamar la nulidad o el cumplimiento de lo convenido en acto de conciliación.

"Art. 461.—El juez no admitirá demanda a que no se acompañe certificación del acto de conciliación, o de haberse intentado sin efecto en los casos en que por derecho corresponda.

"Serán, no obstante, válidas y subsistentes las actuaciones que se hayan practicado sin este requisito, salvo la responsabilidad en que el juez haya incurrido; pero se procederá a la celebración del acto en cualquier estado del pleito en que se note su falta.

"Art. 475.—Lo convenido por las partes en acto de conciliación, se llevará a efecto por el mismo juez municipal por los trámites establecidos para la ejecución de las sentencias dictadas en juicio verbal, cuando su interés no exceda de 1,000 pesetas.

"Siempre que lo convenido exceda de dicha cuantía, tendrá el valor y eficacia de un convenio consignado en documento público y solemne.

"Art. 476.—Contra lo convenido en acto de conciliación, podrá ejercitarse la acción de nulidad por las causas que invalidan los contratos.

"La demanda ejercitando dicha acción deberá interponerse ante el juez de primera instancia del partido, dentro de los ocho días si-

guientes a la celebración del acto, y se sustanciará por los trámites del juicio declarativo que corresponda a su cuantía.

"Si ésta no excediere de 1,000 pesetas, se sustanciará también ante el juez de primera instancia, por los trámites del juicio verbal y sin ulterior recurso.

"Art. 477.—Si no se presentare la demanda ordinaria dentro de los dos años siguientes al acto de conciliación, no producirá efecto alguno este acto, y deberá intentarse de nuevo antes de promover el juicio.

"Art. 478.—Tampoco producirá el efecto de interrumpir la prescripción, si no se promoviere el correspondiente juicio dentro de los dos meses siguientes al acto de conciliación sin avenencia.''

La demanda ordinaria a que se refiere el artículo 477 es el "Juicio Declarativo" indicado en el artículo 459, la cual, por virtud de la disposición terminante del inciso, 6, no es la acción promovida para reclamar la nulidad o el cumplimiento de "lo convenido en acto de conciliación." Si se llegó a un convenio, el objeto del procedimiento preliminar había sido cumplido. La necesidad de establecer el pretendido juicio declarativo había desaparecido. Esta causa de acción original quedó confundida en el nuevo convenio. Cuando estaban envueltas pequeñas sumas esta nueva obligación se hacía cumplir mediante el simple procedimiento de librar una orden de ejecución contra ellas, como si fuera una sentencia. Si era por más de la suma especificada, podría establecerse la acción como en el caso de cualquier contrato hecho constar en documento público. Ni en uno ni en otro caso se exigía un segundo procedimiento preliminar con el fin de transar. Pero si no se llegaba a ningún convenio y el pretendido juicio declarativo no se establecía dentro del término de dos años, entonces el supuesto demandado tenía derecho a otra oportunidad para hacer un convenio.

Los artículos 477 y 478 ambos se referían a procedimientos en los cuales no se había llegado a ningún convenio. El efecto del procedimiento, el cual se perdía si el jui-

cio declarativo no se establecía dentro de dos años, era como un cumplimiento del requisito previo del estatuto para establecer tal acción, o sea, una tentativa infructuosa a promover el juicio. La declaración de que si no se presentase la demanda ordinaria dentro de los dos años al acto de conciliación "no producirá efecto alguno este acto," va seguida de la siguiente disposición de que en tal caso "deberá intentarse de nuevo antes de promover el juicio." Pero como ya se ha indicado, semejantes procedimientos no son necesarios como requisito previo al cumplimiento del convenio después de consumado. Ni tampoco habla el artículo 477 en absoluto de un convenio consumado o transacción, o de sus efectos. Ese artículo se refiere únicamente a procedimientos seguidos con el objeto de tal acto de conciliación y a la ineficacia de dichos procedimientos cuando son infructuosos y no han sido seguidos dentro de los dos años por el juicio declarativo a que alude el artículo 459.

Media docena o más de palabras no pueden quitarse de su sitio y así aisladas dárseles una significación literal enteramente incompatible tanto con el espíritu como con la letra de cualquiera otra cláusula y disposición del mismo párrafo y subdivisión del código.

El tercer señalamiento de error es que la corte inferior incurrió en error al admitir prueba documental de un procedimiento semejante seguido en marzo 9, 1903. La teoría es, además de lo ya discutido, que la orden general número 118 de agosto 15, 1899, reorganizando el sistema judicial y disponiendo que las cortes municipales quedaran compuestas de tres jueces, modificando en cierto modo el anterior procedimiento y derogando todas las disposiciones, incompatibles con lo dispuesto en dicha orden, deroga la práctica de los procedimientos preliminares para obtener un arreglo amistoso. La conclusión es que el procedimiento de 1903 era absolutamente nulo, primero, por no estar autorizado por la Ley de Procedimientos entonces en vigor, y se-

gundo, porque un solo juez municipal presidía la corte en vez de los tres miembros que eran necesarios para constituir la corte.

Los apelantes citan de la orden general en cuestión la primera parte de la sección 24, pero omiten su cláusula final. La referida sección es como sigue (bastardilla nuestra):

"Habrá un Tribunal Municipal, compuesto del Juez Municipal y dos vecinos asociados, en cada distrito municipal, y dos tribunales en San Juan. Dichos asociados *fallarán* juntos con el juez y *firmarán las sentencias que procedan* en los distintos juicios de que conozcan."

El alegato también hace referencia en términos generales a los artículos 66 a 73, como que dejaban vigente la antigua Ley de Enjuiciamiento Civil y afirma que no hay ninguna disposición sobre el procedimiento preliminar. El primer párrafo del artículo 72 es como sigue:

"Las *acciones,* excepciones y pruebas, en los diversos juicios, serán las mismas que determina la Ley de Enjuiciamiento Civil y según que la demanda sea declarativa, ejecutiva, de interdicto, de desahucio o de otra índole."

Y dice también el apelante:

"Hay que notar que en el antiguo procedimiento el acto de conciliación, en lo que se refería al juicio ordinario, era de un carácter sustancial, de tal forma, que no haberlo intentado constituía una grave excepción dentro del juicio, y éste no podía seguirse a menos que el acto se intentara o se celebrara. Era pues, una forma de enjuiciar; y era una forma distinta de las creadas por la Orden General Número 118. Y siendo esto así, es indudable que ese acto cayó bajo el precepto derogatorio del artículo 74, Orden General número 118."

Al artículo 74 sigue, sin embargo, el 75. Ambos deben ser leídos conjuntamente y son como sigue:

"74.—Quedan derogadas todas las disposiciones de la Ley de

Enjuiciamiento Civil y Criminal que concreta y especialmente se refieren a formas o maneras de enjuiciar, distintas o contrarias a las prescripciones en esta Orden, para toda clase de juicios.

"75.—Los juicios verbales y procedimientos ante los jueces municipales, así en lo civil como en lo criminal, subsistirán en la misma forma que hoy tienen con arreglo a Ley."

El alegato del apelante no contiene ninguna indicación más definida de en qué parte eran en alguna forma "diferentes o contrarias a" las disposiciones de esa orden los particulares del anterior procedimiento que ahora se alega quedaron abolidos por la orden general número 118. El apelante asume, más bien que trata de demostrar, que la orden general tenía el efecto que se le atribuyó. Pero aun cuando quedara esto establecido, el apelante siempre quedaría obligado a demostrar que ya el alegado procedimiento no autorizado, o la falta de jurisdicción, viciaban necesariamente el convenio a que realmente se llegó. Un punto de partida excelente para investigar en este sentido se indicaba claramente en la anterior opinión de esta corte, *supra*. La influencia directa de lo que se dijo entonces sobre el amplio hiato que existe entre la premisa y la conclusión envuelta en el razonamiento de los apelantes en este caso, parece haberse escapado a la atención de los abogados.

La única significación lógica de los procedimientos de 1903 es en relación con la alegada ratificación de la obligación de pagar intereses compuestos contraída en 1885, y según el criterio que formamos del asunto, como se verá más luego, el error, de haber alguno, al admitir la prueba de los procedimientos subsiguientes, no resulta perjudicial.

La cuarta proposición sometida por los apelantes es que la corte inferior incurrió en error al apreciar la prueba en su totalidad y al no declarar que el acto de conciliación de abril 25, 1885, no fué en realidad celebrado nunca, y que el récord original del mismo era simulado. El discutir en sus pormenores los méritos de la cuestión que aquí ha sido pro-

movida, no conduciría a ningún fin práctico.  No encontramos que haya habido un error tan manifiesto que exija la revocación de la sentencia.

El quinto señalamiento es que la corte incurrió en error al dar efecto de interrupción de la prescripción a los procedimientos a que acabamos de referirnos.  La corte inferior no atribuye a ese procedimiento el efecto a que se ha aludido.  Pero si lo hubiera hecho las cuestiones que aquí se tratan de promover son en substancia idénticas a las ya discutidas y resueltas en relación con el segundo señalamiento.

Pasan entonces los apelantes a insistir en que la corte inferior cometió error al resolver que la obligación, si alguna hubo, que se contrajo por virtud del acto de conciliación de abril 25, 1885, (y si la misma tuvo algún efecto legal después de transcurrir los dos años sin entablarse la acción,) era sin término.

Lo que la corte dijo respecto a la naturaleza y el término de la obligación contenidos en el acto de conciliación de 1885 era esto:

"Ya hemos visto que Ramón Pérez Villamil en el acto de conciliación de 25 de abril de 1885, señaló como plazo para el cumplimiento de su obligación un día que él mismo se comprometió a fijar, dos meses antes de emprender su viaje de regreso definitivo a España, para que en ese día compareciese Telesfora Quiñones, acompañada de persona idónea y de notario que fuese de su agrado, en el lugar que al efecto el mismo deudor le indicaría para que practicasen, de acuerdo, la liquidación general de todo y hacerle entrega de la suma que resultare a favor de la demandante, previa carta de pago que ésta debía otorgar en el acto de recibir su importe.

"Como se ve, la obligación de liquidar los intereses del capital prestado y la cuenta del ganado y de entregar su resultado a la demandante era clara, definitiva y pura: su cumplimiento sólo dependía del suceso futuro y cierto del viaje de regreso definitivo a España de Ramón Pérez Villamil que necesariamente tenía que llegar por habérselo prescrito los facultativos que le asistían, como

único remedio al mal estado de su salud.'' Hacemos la siguiente cita del alegato de los apelantes:

''Evidentemente la transacción referida se desenvuelve dentro de las tres siguientes estipulaciones:

''(*a*) Pacto de continuar la administración de Villamil hasta que realizare el viaje a España impuesto por su estado de salud y consiguientemente proyectado para un breve término.·

''(*b*) Pacto de abonar a partir del día primero de mayo de 1885 y hasta la terminación de su administración, el interés del nueve por ·ciento anual capitalizado anualmente.

''(*c*) Pacto de practicar una liquidación general de cuentas y pagar. Villamil la suma que de ella resultare adeudar dentro de los dos meses precedentes a su dicho viaje a España, del que daría el oportuno aviso.

''Pero no es menos evidente que los tres enunciados pactos, por propia y espontánea exigencia de Telesfora Quiñones, quedaron subordinados a la realización de otro hecho distinto de los encerrados en tales pactos y necesario para la virtualidad de dicha transacción, cual lo era una liquidación y determinación fija y exacta de los intereses que hasta aquel momento adeudaba Villamil por razón del préstamo, los que al sumarse al capital principal permitirían a la demandante conocer de modo cierto el alcance de su fortuna y· permitirían a su vez al demandado fijar también de modo cierto el exacto montante de sus responsabilidades.

''Es por ello que la práctica previa de tal liquidación se impone y acepta con la exigencia y el alcance de una condición, que adosada al primero y principal de aquellos pactos, esto es, al que se contrae a la duración de la administración, está revelando de modo claro su condición de elemento necesario y consustancial del contrato, y como tal principal determinante de las voluntades de ambos contratantes, en la transacción que efectúan.

''Parece innecesario consignar que la liquidación de intereses integrante de la condición a que nos venimos refiriendo, no es ni confundirse puede con la liquidación general de todo el negocio.

''Aquélla ·debía practicarse el 30 de abril de 1885 con el determinado propósito de poder capitalizar a partir del día primero de mayo siguiente todos los intereses adeudados hasta dicho día y en el futuro devengar el nuevo interés contractual del nueve por ciento anual: esa liquidación se relaciona exclusivamente con el capital

prestado. La liquidación general por el contrario debía versar sobre el préstamo y ganado, efectuarse como término y cierre de la administración dentro de los dos meses precedentes al viaje de Villamil.

"No cabe pues, términos de confusión entre una y otra, no obstante tener ambas concepto y denominación de liquidaciones."

En una argumentación que toma unas quince páginas de escritura a máquina, los apelantes insisten en que inmediatamente después de haber dejado Villamil de liquidar la cuenta más antigua dentro de los cinco días siguientes a su ofrecimiento de cumplir con esa obligación, todas las demás obligaciones contraídas por él en el acto de conciliación de 1885 dejaron de existir.

Es cosa que puede concebirse que una mujer sin instrucción, colocada en la situación en que estaba Telesfora Quiñones desde sus quince años de edad, movida por el sutil llamamiento de su vanidad que ocultaban los elogios que se le tributaban por su bondad de alma y gran afecto maternal e "impulsada no sólo por el afecto que le guarda a su demandado, padre de sus tres hijos * * * sino también por las consideraciones hechas por su hombre bueno señor Quiñones Correa y las demás personas," que participaban en los procedimientos, pudo haber sido inducida a estar conforme en que Villamil, además de tener derecho a fijar la fecha en la cual cumpliría su convenio solemne y promesa de verificar el pago, también podría resolver eximirse completamente de semejante obligación principal por el simple procedimiento de no cumplir un acto superficial de poca o ninguna importancia para una u otra de las partes, y mucho menos para la demandante. Pero no parece probable que "un hombre bueno," con inteligencia suficiente para exigir como remedio a la continuada administración de la propiedad de la demandante por Villamil "y por un término que su demandado creyera conveniente para ambos" un aumento en el tipo anterior de intereses, hubiera deliberada-

mente convenido en semejante proposición ilusoria. Ni en-
contramos tampoco en los autos del procedimiento ninguna
evidencia muy persuasiva de tal intención. Esos autos ha-
blan por sí y no es necesario analizarlos en detalle para
que nuestra conclusión en este sentido quede sostenida.
Nos basta con hacer una cita de Scaevola, que aparece en
el alegato del apelado y es como sigue:

"Por lo demás, el requisito más importante de una condición,
el que verdaderamente le da carácter de tal y la distingue de to-
das las demás modalidades jurídicas o indicaciones accidentales de
un contrato, es la dependencia del derecho o de la obligación, con
carácter de necesidad, respecto del acontecimiento designado al
efecto. No todo aquello a que se subordina un derecho o un deber
constituye una condición, puesto que si en el pensamiento de las
partes el hecho de que se trata puede ser sustituído de alguna ma-
nera, o, si se quiere, suprimido, sin que el propósito inicial se re-
sienta, habrá algo en ello que tendrá valor, más o menos grande,
y que deberá procurarse, más o menos, pero que no afectará en
definitiva a la existencia de la obligación principal. Si Pedro se
obligó a entregar a Antonio una suma no determinada, y se de-
signó a Mariano para que la liquidase, y Mariano muere sin ha-
berlo efectuado, no por eso la obligación dejará de existir, sea la
que sea la forma con que se sustituya el procedimiento de liqui-
dación. Hay que distinguir entre lo esencial y lo accidental, en-
tre el fondo y la forma, entre lo necesario y lo contingente, y no
calificar como condición sino aquello que imperiosa, necesaria, in-
sustituiblemente, debía realizarse para que quedara satisfecho el
pensamiento de los que contrataron."

En el año 1903 no se le ocurrió a Villamil alegar una
condición precedente no cumplida. La interpretación que
entonces él mismo dió a su convenio y con la cual estuvo
conforme la demandante fué la interpretación que adoptó
la corte inferior y que ahora se alega que es un error per-
judicial. Los autos en conjunto no dejan lugar a duda al-
guna respecto a cuál hubiera sido la actitud de Villamil si
la demandante en el mes de mayo de 1885 se hubiera de-
cidido a considerar la conciliación como nula y sin ningún

valor, considerar a las partes como relegadas a su anterior condición (*statu quo*) y exigir la inmediata devolución del dinero y ganado de ella, basada en el incumplimiento de una condición precedente.

Esa es una nueva teoría presentada como último recurso debido a la exigencia de la situación actual. La proposición fundamental en que descansa nunca estuvo en la mente de las partes contratantes. La conclusión contraria envolvería la hipótesis de que el amigable componedor del demandante en el año 1885 o no era honrado o estaba incapacitado mentalmente.

Otra contención es que la corte inferior cometió error al no resolver que la acción había prescrito y al no declarar que el alegado procedimiento en el año 1903 no interrumpió el transcurso del término prescrito por la ley. Aquí también la teoría es que la causa de acción de la demandante surgió en el año 1885 por el incumplimiento de la alegada condición previa y el argumento es prácticamente una repetición del presentado bajo los señalamientos segundo y sexto.

El octavo señalamiento de error es como sigue:

"La corte erró con infracción del artículo 7º de la Ley de 14 de marzo de 1856 sobre intereses, al estimar lícito y eficaz el pacto sobre capitalización de intereses durante el término del contrato, que encierra el acto de conciliación de 25 de abril de 1885; y como consecuencia de tal error, erró igualmente al fijar en 56,025 pesos noventa y ocho centavos españoles, la suma que se dice adeudada en 30 de noviembre de 1915, mediante la capitalización de intereses devengados al tipo de 9% anual desde el 1º. de marzo de 1885 hasta el dicho día 30 de noviembre de 1915: y erró igualmente al condenar a los demandados al pago de la antes expresada cantidad o su equivalencia en moneda americana, más sus intereses al nueve por ciento (9%) anual, capitalizado todos los años, desde 1º. de diciembre de 1915 hasta el completo pago de la deuda."

La posición que aquí asume el apelante está bien soste-

nida tanto por los anteriores precedentes españoles como por la doctrina de las cortes americanas. Sentencias del Tribunal Supremo de España de 28 de octubre de 1871, 18 de enero, 1873, 4 de mayo, 1874, 16 de diciembre, 1887, 28 de junio, 1897; Resolución de la Dirección de los Registros de 3 de mayo de 1884; 15 R. C. L., p. 36.

Sin embargo, desde la adopción del Código Civil la Corte Suprema de España ha mostrado una inclinación a sostener la validez de los contratos sobre pago de intereses compuestos. Sentencias del Tribunal Supremo de España de 6 de febrero, 1906, y 15 de octubre, 1902; Resolución de la Dirección de los Registros de 16 de octubre, 1903.

Estas resoluciones más recientes se fundan en ciertos artículos del Código Civil, y especialmente en el artículo 1109, equivalente al 1076 de nuestro código, el cual prescribe lo siguiente:

"Art. 1076.—Los intereses vencidos devengan el interés legal desde que son judicialmente reclamados, aunque la obligación haya guardado silencio sobre este punto.

"En los negocios comerciales se estará a lo que dispone el Código de Comercio.

"Las cajas de ahorros se regirán por sus reglamentos especiales."

El *ratio decidendi* parece ser que las palabras "aunque la obligación haya guardado silencio sobre este punto," interpretadas en relación con otras prescripciones relativas a la libre contratación, implican que las partes pueden estipular por adelantado el pago de intereses compuestos. En cuanto a nosotros, por supuesto, las derogaciones tácitas no son favorecidas y esto parece ser una base muy poco sólida en que hacer descansar una conclusión de tanto peso. Desde luego que también estas decisiones dictadas por la Corte Suprema de España desde el cambio de soberanía no son obligatorias para esta corte, pues estamos en libertad de interpretar, y de hecho interpretamos, nuestras leyes de

acuerdo con nuestras propias reglas de interpretación estatutoria. Además, cuando están envueltas cuestiones de orden público, nos sentimos particularmente inclinados a observar los principios generales enunciados por nuestras cortes.

Sin embargo, según el criterio que formamos del presente caso, no se hace necesario resolver esta cuestión tan interesante, que es digna de una consideración más detenida de la que ahora podemos darle. El convenio de pagar intereses compuestos fué indiscutiblemente nulo en el año 1885, fecha en que se hizo, y no podemos convenir con el abogado de la demandante en que fué ratificado por Villamil en 1903. Los autos del procedimiento de 1903, en tanto son pertinentes a esta cuestión, expresan lo siguiente:

"Concedida la palabra a la actora por el señor juez, por conducto de su hombre bueno, hubo de exponer, que reproduce su demanda, solicitando de la autoridad judicial, que obligue a su demandado a que le entregue el ganado vacuno y caballar con la mitad de las utilidades, tenidas hasta hoy, así como los dos mil pesos moneda española, que le adeuda desde el año de mil ochocientos sesenta y ocho, con sus intereses convenidos, del seis y nueve por ciento anual, pues a pesar de los distintos requerimientos que le tiene hecho a su demandado, tanto personalmente, como por conducto de personas amigas, no ha podido conseguir la que habla el objeto deseado, y de aquí el que se haya visto en la necesidad de establecer la presente demanda, aun contra su voluntad. El demandado expuso, que nunca ha negado, haber recibido de su demandante, y en la forma que ha expresado, los bienes a que la misma señora Telesfora se ha referido, y así lo tiene manifestado, en un juicio que se celebró en el juzgado de paz de este pueblo, el día cuatro de noviembre de mil ochocientos setenta y tres, ante el juez Don Santos Jiménez, así como en otro de conciliación celebrado también entre ambos el veinte y cuatro, digo, veinticinco del mes de abril del año de mil ochocientos ochenta y cinco, ante el juez municipal suplente, don Timoteo González, y como quiera que en este juicio se consignaron de una manera clara, precisa y terminante, la fecha o época, en que el declarante debe liquidar las cuentas que tiene pendientes con su demandante y entregarle su importe, no está dispuesto a

lo que ésta pretende hoy, porque faltaría a lo estipulado en el citado juicio, a menos que se le ordene por sentencia judicial. Por tanto, entiende el que habla, que la demandante puede seguir sus gestiones en la forma que más le plazca. Y no habiéndose avenido las partes, ni podido llegar a un acuerdo los hombres buenos de las mismas, a pesar del buen deseo de que estaban animados, el señor juez dió por terminado el acto . . . . ."

Tal vez en el año 1903 las partes pudieron haber hecho un contrato nuevo e independiente para el pago de intereses compuestos sobre los plazos entonces vencidos. Pero parece ser bastante dudoso, cuando menos, que una mera ratificación del anterior convenio ilegal, por clara que apareciera, tácita o expresamente, podía dejarse en pie.

"Sea cual fuere la ley en cuanto a casos que no envuelven cuestión alguna de ilegalidad, es muy claro que la regla general en cuanto al efecto de una transacción no puede tener aplicación cuando la reclamación envuelta en ellos se basaba enteramente en una causa ilegal, a diferencia de una meramente insuficiente. Esta regla, reconocida universalmente, no se funda en ninguna consideración para la parte contra la cual se solicita el remedio y que resultará beneficiada por la negativa de la corte a conceder dicho remedio, sino en consideraciones de sana política pública. Cualquier contrato celebrado en consideración de uno anterior ilegal, o para transigir diferencias que de éste surjan, hablando en términos generales es, lo mismo que aquel en que descansa, ilegal e imposible de hacerse cumplir." 5 *Ruling Case Law* pág. 884, sección 8.

Pero sea esto como fuere, el artículo 1716 de nuestro Código Civil dispone expresamente que:

"La transacción no comprende sino los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma.

"La renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre que ha recaído la transacción."

El lenguaje que acaba de citarse es demasiado claro

para ser susceptible de interpretación o exigir cita de casos en los cuales la regla así prescrita ha sido aplicada. Citamos de paso, sin embargo, la siguiente breve referencia a una disposición semejante hecha por la Corte Suprema de Filipinas en el caso de *Ferrer* v. *Ignacio,* 39 Jurisprudencia Filipina pág. 458:

"Hemos llegado a esta conclusión teniendo en cuenta que se trata de un contrato de transacción, por el cual la demandante y los demandados han dado por terminado un pleito, y que esta clase de contrato es de interpretación estricta y debe entenderse que sólo comprende lo que expresa determinadamente, o aquello que, por una inducción necesaria de su letra, deba reputarse comprendido en él.   (Art. 1815 del Código Civil.)"

El resultado del procedimiento del año 1903, en tanto en él puede hallarse alguna inteligencia de voluntades, fué un convenio de transacción basado en los anteriores procedimientos de 1885 y su resultado.  Cualquier ratificación que pueda hallarse en los autos posteriores con respecto a la anterior obligación, o es un convenio de transacción o no es nada.

Pero aun siendo de otro modo, nada encontramos en la declaración prestada por Villamil en el año 1903 que equivalga a una ratificación de la anterior promesa de pagar intereses compuestos.

Dijo Villamil que nunca había negado haber recibido de la demandante "en la forma que ha expresado" la propiedad en cuestión.  Pero la forma en la cual la demandante alegó que la propiedad había sido recibida no hacía mención de intereses compuestos.  Aun al requerimiento de la demandante para la devolución de los dos mil pesos "con sus intereses convenidos, del seis y nueve por ciento anual" no implica necesariamente una obligación de pagar intereses compuestos, por la simple razón de que no había tal obligación válida existente.  Para la ley no hubo ningún convenio en este sentido.  Ni tampoco la insistencia de Villa-

mil en la estipulación anterior en cuanto a la fecha y forma en la cual el demandado liquidaría la cuenta pendiente y entregaría su importe puede cambiarse en una promesa tácita de pagar intereses compuestos. El "importe" que había de pagarse era aquella suma que estuviera debiéndose como resultado de la liquidación final a que se ha hecho referencia; y de acuerdo con la ley que regulaba el contrato original no podía haber incluído intereses compuestos. Por ninguna interpretación razonable puede quedar comprendida en el lenguaje empleado por Villamil en el año 1903 la ratificación de su anterior promesa de pagar intereses compuestos, que desde el principio debió saber él que no podía hacerse cumplir en su contra, cualquiera que hubiera sido su primitiva intención con respecto a un futuro cumplimiento opcional.

Debe modificarse la sentencia apelada para ajustarla a la conclusión a que hemos llegado con respecto al octavo señalamiento, y así modificada confirmarse.

> *Confirmada la sentencia apelada, modificándola.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Wolf y Aldrey.

El Juez Asociado Sr. Franco Soto no intervino en la resolución de este caso.