# 2003 DTA 90

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL DE SAN JUAN
PANEL IV**

CARLOS MALDONADO, ZULEMA QUESADA
Recurridos

v.

ROOMS TO GO P.R., INC.
Recurrente

Núm. KLRA-02-00545

San Juan, Puerto Rico, a 16 de mayo de 2003

Panel integrado por su Presidente, Juez Gierbolini
y los Jueces Cordero y Rodríguez Muñiz

Cordero, Juez Ponente

██

**TEXTO COMPLETO DE LA SENTENCIA**

Oportunamente, Rooms To Go, Inc. ("*Rooms To Go*"), presentó un recurso en el que nos solicitó la Revisión de una Resolución emitida y notificada por el Departamento de Asuntos del Consumidor ("*DACO*") el 20 de mayo de 2002. Rooms To Go solicitó reconsideración el 7 de junio de 2002, la cual fue entendida rechazada de plano. Veamos los hechos.

**I**

Carlos Maldonado y Zulema Quesada (en adelante por el singular "*Maldonado*") acudieron a la tienda Rooms To Go el 7 de mayo de 2000 para adquirir un juego de cuarto. Maldonado compró por un total de $2,969.93 un primer juego de cuarto ("*Mueble 1*") laminado consistente de varias piezas. Rooms To Go procedió a entregar el Mueble 1 el 26 de mayo de 2000. Tan pronto como el 30 de mayo de 2000, Maldonado llamó a Rooms To Go y solicitó que el reemplazo de una de las agarraderas del referido Mueble 1 por estar está dañada. Rooms To Go la repuso y la instaló el 19 de junio de 2000. Allá para el 24 de octubre de 2000, Maldonado llamó nuevamente a Rooms To Go y notificó que el Mueble 1 presentaba problemas en el laminado el cual estaba despegado. Rooms To Go envió un técnico para inspeccionar el Mueble 1 y recomendó la sustitución de las gavetas dañadas. Así se hizo. Sin embargo, poco tiempo después, Maldonado notificó a Rooms To Go que un pedazo del laminado de la mesa de noche estaba desprendido, por lo que Rooms To Go ordenó una nueva mesa de noche para intercambiar la dañada. No obstante, ante tales desperfectos, Maldonado solicitó a Rooms To Go que le permitiera seleccionar otro juego de cuarto lo que fue debidamente autorizado.

Maldonado visitó otra vez a Rooms To Go para escoger un segundo juego de cuarto ("*Mueble 2*"), el cual fue seleccionado de madera sólida. El costo del mismo ascendió a $3,239.98 ██ de los cuales Rooms To Go acreditó a Maldonado $2,059.96, por lo que éste pagó la diferencia de $1,180.02. Cuando el Mueble 2 fue entregado el 1ro de mayo de 2001, el chofer de Rooms To Go, Edgar Hernández, rompió una de las esquinas de una mesa, lo cual le fue indicado por Maldonado. Este, a su vez, le indicó al chofer que las gavetas estaban descuadradas y que las mismas tenían diseños diferentes; además, le mencionó sobre el desprendimiento de uno de los adornos de los pilares de la cama del Mueble 2.

Posteriormente, Maldonado presentó querella ante el DACO el 29 de mayo de 2001 en la que solicitó la resolución del contrato ante la inacción de Rooms To Go para corregir los desperfectos notificados a su empleado. Celebrada la correspondiente vista, el DACO determinó que procedía la acción redhibitoria y ordenó a Rooms To Go recoger los muebles objeto de controversia y pagar a Maldonado la cantidad pagada por éste ascendente a $4,149.95, más la cantidad de $2,000.00, en concepto de daños y perjuicios y angustias mentales, más $1,000.00 en concepto de honorarios de abogado.

Inconforme, Rooms To Go solicitó reconsideración ante el DACO, la cual fue rechazada de plano, por lo cual acude ante este Tribunal y nos señaló que:

"*1. Erró la Honorable Juez Administrativo del Departamento de Asuntos del Consumidor al determinar que la evidencia ofrecida por la firma querellada-recurrente constituia prueba de referencia inadmisible bajo la norma general de exclusión de la prueba de referencia porque era imprescindible el testimonio de todos y*

*cada uno de los empleados que de una forma u otra intervinieron en la preparación de dicho informe.*

*2. Erró la Honorable Juez Administrativo del Departamento de Asuntos del Consumidor al determinar que el Mueble 2, o sea, el segundo juego de cuarto seleccionado por los querellantes-recurridos, adolece de vicios ocultos, por lo que procedía la resolución del contrato de compraventa efectuado por las partes.*

*3. Erró la Honorable Juez Administrativo del Departamento de Asuntos del Consumidor al valorizar los daños."*

## II

Antes de comenzar el análisis de los señalamientos de errores presentados por Rooms To Go, debemos recordar que en nuestra función revisora, debemos ser cautelosos al intervenir con las determinaciones administrativas de los foros especializados porque las conclusiones y determinaciones de los organismos administrativos merecen gran consideración y respeto por los tribunales en la etapa de revisión judicial, *Rivera Concepción v. Administración de Reglamentos y Permisos*, ___D.P.R.___ (2000), **2000 J.T.S. 155**, a la pág. 160; *Assoc. Ins. Agencies, Inc. v. Com. de Seguros*, 144 D.P.R. 425, 436 (1997); *Misión Ind. v. J.P. y A.A.A.*, 142 D.P.R. 656, 672-673 (1997); *Metropolitana, S.E. v. A.R.P.E.*, 138 D.P.R. 200, 213 (1995); *Viajes Gallardo v. Clavell*, 131 D.P.R. 275, 289-290 (1992).

La revisión judicial es limitada. Sólo determina si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que abusó de su discreción. *Municipio de San Juan v. Junta de Calidad Ambiental*, ___D.P.R.___ (1999), **99 J.T.S. 152**, a la pág. 125; *T-JAC, Inc. v. Caguas Centrum Limited Partnerhip, S.E.*, ___D.P.R.___ (1999), **99 J.T.S. 60**, a la pág. 884; *Fuertes y otros v. A.R.P.E.*, 134 D.P.R. 947, 953 (1993). A tenor con esta norma de deferencia, los tribunales no alteran las determinaciones de hechos de los organismos administrativos si del expediente administrativo surge evidencia sustancial que las sostenga. Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal. 3 L.P.R.A. § 2175; *Municipio de San Juan v. Junta de Calidad Ambiental*, ___D.P.R.___ (2000), **2000 J.T.S. 193**, a la pág. 474; *Asociación de Vecinos del Hospital San Jorge v. United Medical Corporation y Gerónimo Partnership, Etc.*, ___D.P.R.___ (2000), **2000 J.T.S. 21**, a las págs. 560-561; *Domínguez Talavera v. Caguas Expressway Motors, Inc.*, ___D.P.R.___ (1999), **99 J.T.S. 85**, a las págs. 1067-1068; *T-JAC, Inc. v. Caguas Centrum Limited Partnership, S.E., supra*, a la pág. 884; *García Oyola v. J.C.A.*, 142 D.P.R. 532, 540 (1997); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521, 532-533 (1993).

El propósito de la regla de evidencia sustancial aplicable a las determinaciones de hechos de las agencias administrativas es *"evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor." Reyes Salcedo v. Policía de Puerto Rico*, 143 D.P.R. 85, 95 (1997); *López v. Junta de Planificación*, 80 D.P.R. 646, 673 (1958). La evidencia sustancial *"es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión." Asociación de Vecinos del Hospital San Jorge v. United Medical Corporation y Gerónimo Partnership, Etc., supra*, a la pág. 561; *Ramírez Rivera v. Departamento de Salud*, ___D.P.R.___ (1999), **99 J.T.S. 47**, a la pág. 817; *Misión Industrial v. Junta de Planificación*, 146 D.P.R. 64, 131 (1998).

Por consiguiente, para convencer al tribunal de que la evidencia utilizada por la agencia para formular una determinación de hecho no es sustancial, la parte afectada debe demostrar que existe otra prueba en el récord que reduzca o menoscabe el valor probatorio de la evidencia impugnada **hasta el punto de que no pueda ser concluido que la determinación de la agencia fue razonable de acuerdo a la totalidad de la prueba que tuvo ante su consideración**, *Municipio de San Juan v. Junta de Calidad Ambiental, supra*, a la pág. 473; *Ramírez Rivera v. Departamento de Salud, supra*, a la pág. 817; *Hilton Hotels v. Junta de Salario Mínimo*, 74 D.P.R. 670, 686 (1953).

No obstante, el tribunal debe sostener la resolución de un **conflicto probatorio por parte de la agencia,**

**siempre que ésta haya sido apoyada en una base racional.** *J.R.T. v. Línea Suprema, Inc.,* 89 D.P.R. 840, 849 (1964).

La evidencia sustancial se considera menos que la preponderancia de la evidencia y por ello es posible que, tomando en cuenta tanto la evidencia que sostiene la determinación como la que reduce el peso dado por la agencia, sea preponderante en contra de la decisión de la agencia. No obstante, la decisión de la agencia tiene que sostenerse por más de una mera scintilla de la evidencia. **De existir dos interpretaciones razonables, la selección de la agencia debe prevalecer.** La cuestión es si la determinación de la agencia es razonable y no si la agencia logró la determinación correcta del hecho o los hechos. Demetrio Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, Colombia, Ed. Forum, 1993, pág. 531.

### III

En cuanto a la aplicabilidad de las Reglas de Evidencia a las vistas administrativas, la sección 3.13(e) de la Ley Núm. 170 de 12 de agosto de 1988, conocida como la Ley de Procedimiento Administrativo Uniforme (*"LPAU"*), dispone que:

*"(e) Las Reglas de Evidencia no serán aplicables a las vistas administrativas, pero los principios fundamentales de evidencia se podrán utilizar para lograr una solución rápida, justa y económica del procedimiento. 3 L.P.R.A. § 2163(e)."*

La razón de ser es que ello facilita la presentación de prueba en los procedimientos administrativos. *López Vives v. Policía de Puerto Rico*, 118 D.P.R. 219, 231 (1987); E.L. Chiesa, *Práctica Procesal Puertorriqueña Vol I-Evidencia*, **Publicaciones J.T.S.** (1979), a la pág. 2. Pretender que los procedimientos administrativos se efectúen con el rigor de las Reglas Procesales y de Evidencia, sería ir en contra del espíritu creador de las agencias administrativas, las cuales han sido creadas con el objetivo de establecer un sistema de adjudicación justo, económico y práctico, razón por la cual fue dotado de una flexibilidad mayor que la del trámite judicial ordinario. *Pérez Ríos v. Hull Dobbs,* 107 D.P.R. 834, 840 (1978).

Las Reglas de Evidencia establecen que toda evidencia pertinente es admisible, excepto cuando de otro modo se disponga por ley o por las reglas de evidencia. 32 L.P.R.A. Ap. IV, R. 18. Así, la evidencia pertinente es aquélla tendente a hacer la existencia de un hecho más probable o menos probable de lo que sería sin tal evidencia; dicho hecho debe a su vez, referirse a una cuestión en controversia o a la credibilidad de algún testigo o declarante. No obstante, existe en nuestro derecho probatorio la llamada prueba de referencia que indica que no será admisible prueba de referencia, salvo que por ley se disponga otra cosa. 32 L.P.R.A. Ap. IV, R. 61. La prueba de referencia no es otra cosa que una declaración aparte de la que hace la persona que hace la declaración al testificar en el juicio o vista, y que se ofrece en evidencia para probar la verdad de lo aseverado. 32 L.P.R.A. Ap. IV, R. 60.

Como excepción a la regla de prueba de referencia, son admisibles, en lo pertinente, como evidencia los récords del negocio o actividad. La Regla de Evidencia dispone:

*"65(F) Récords del negocio o actividad*

*Un escrito hecho como récord de un acto, condición o evento si el escrito fue hecho durante el curso regular de un negocio, en o próximo al momento del acto, condición o evento, y el custodio de dicho escrito u otro testigo declara sobre su identidad y el método de su preparación, siempre que las fuentes de información, método y momento de su preparación fueran tales que indiquen su confiabilidad. El término "negocio" incluye además de negocios propiamente, una actividad gubernamental, profesión, ocupación, vocación u operación de instituciones, ya sea con o sin fines pecuniarios."* 32 L.P.R.A. Ap. IV.

Los requisitos para la admisibilidad del escrito o récord bajo la Regla 65(F), *supra*, son los siguientes: (1) que fuera hecho durante el curso regular del negocio; (2) en o próximo al momento del acto, condición o suceso a que se refiere el récord; (3) el custodio de éste, o algún otro testigo, declara sobre su identidad y método de preparación, y (4) las fuentes de información, método y momento de la preparación del récord son tales que indican confiabilidad.

Al respecto, los comentaristas han expresado que en estos casos se requiere el testimonio de un testigo -el custodio de los récords o cualquiera otro- que declare en torno a la identidad del escrito, y cuándo y cómo fue éste preparado. Tal testimonio es esencial para determinar la confiabilidad. No se requiere la comparecencia del informante ni de todos los que de una u otra manera intervienen en la cadena de información conducente al asiento en los récords del negocio. No se requiere que el testigo tenga conocimiento personal del contenido de las declaraciones, pero debe tener conocimiento de cómo se preparan los récords pertinentes en el negocio, aunque no tenga conocimiento personal con relación al asiento específico. Chiesa, *supra,* a la pág. 400. Es decir, bajo la Regla 65(F) de Evidencia, antes de que pueda admitirse un documento en evidencia, es necesario sentar adecuadamente las bases para su admisión. Se requiere, por tanto, el testimonio de un testigo cualificado que declare sobre los requisitos que exige la norma como condición a la admisibilidad del récord del negocio. *H.R. Stationery, Inc. v. E.L.A.,* 119 D.P.R. 129, 139-140 (1987).

No obstante, la norma general dispone que no se revocará una sentencia por motivo de exclusión errónea de evidencia, a menos que ésta sea un factor determinante o sustancial en la decisión emitida por el Tribunal de Primera Instancia y que de no excluirse, el resultado habría sido distinto. Véase Regla 5 de Evidencia, 32 L.P.R. A. Ap. ___; *F.D.I.C. v. Caribbean Marketing Insurance Agency Corp.,* 123 D.P.R. 247, 260 (1989).

## IV

En el caso ante nos, Rooms To Go nos señaló que ofreció en la vista administrativa como prueba para rebatir cada una de las alegaciones de los querellantes el *Récord o Informe de Negocios de Rooms To Go*, el cual no fue admitido, ya que se adujo que el mismo constituia prueba de referencia inadmisible bajo la norma general de exclusión de prueba de referencia y que era necesario el testimonio de todos y cada uno de los empleados que de una forma u otra intervinieron en la preparación de dicho informe. Rooms To Go nos señaló que para autenticar dicho informe, testificó la Sra. Jessica Pagán, Gerente del Departamento de Servicios al Cliente de Rooms To Go. Esta indicó ser la custodia de dichos documentos, que éstos fueron realizados durante el curso regular del negocio y de forma contemporánea al hecho ocurrido. Rooms To Go nos argumentó que la exclusión de dicha evidencia fue un factor decisivo en la decisión emitida por el DACO, ya que Rooms To Go no pudo *"defenderse en forma adecuada ni rebatir eficazmente evidencia presentada por la parte querellante."* Añadió que de haberse presentado el Récord de Negocios de Rooms To Go *"en relación al Mueble 2, se demostraría claramente que los querellantes NUNCA reclamaron directamente a la parte querellada-recurrente los alegados desperfectos, sino que descansaron en la información que le suministraron al chofer al momento del recogido del Mueble 1 y entrega del Mueble 2; incluso los restantes desperfectos fueron presentados por primera vez durante la celebración de la vista."*

Ciertamente, las Reglas de Evidencia no son aplicables a las vistas administrativas, pero se pueden utilizar para lograr una solución rápida, justa y económica del procedimiento. En el caso de autos, Rooms To Go sentó apropiadamente las bases para establecer que el récord del negocio es una excepción a la inadmisibilidad de prueba de referencia. El récord en cuestión no mostraba trámite alguno luego de la entrega del Mueble 2. Con ello, Rooms To Go pretendía demostrar que los querellantes no le brindaron la oportunidad para corregir los desperfectos del mueble. No obstante, aunque el error fue cometido, no conlleva de por sí la revocación de la Resolución emitida por el DACO.

Durante la vista administrativa celebrada, Rooms To Go presentó el testimonio de la Sra. Jessica Pagán quien indicó que: *"Originalmente, refiriéndose a la segunda entrega, el cliente, no tenemos, en sistema que el*

*cliente llamó para hacer reclamación alguna referente al juego de cuarto. Cada vez que se entra una orden, tenemos que preparar la orden, el porqué se entró a la orden, si el cliente llamó para ver si es la fecha de entrega, si fue que el cliente llamó para hacer reclamación alguna. Y tenemos sistema que no, no, el cliente no llamó para hacer ninguna reclamación."* A su vez, Rooms To Go tuvo la oportunidad de contra interrogar a Maldonado:

Lcda. Cebolleros

P La reclamación que usted nos hizo en relación con el segundo juego de cuarto, fue que tenía la mesa una esquina rota, ¿sí o no?

Maldonado

R No.

Lcda. Cebolleros

P ¿Eso no fue la reclamación?

Maldonado

R No, fue otra cosa.

Lcda. Cebolleros

P Esa no fue.

Maldonado

R No.

Lcda. Cebolleros

P ¿Luego de eso, usted no se ha comunicado más con nosotros, luego de esa reclamación de esa mesa de noche Nosotros.

Maldonado

R Sí, no, no, ni ustedes tampoco se han comunicado.

Ante estas circunstancias, ciertamente Rooms To Go tuvo amplia oportunidad de establecer que no fue notificado y a su vez, impugnar la alegación de que sí fue notificado de los desperfectos del juego de cuarto. La no admisión del récord de negocio no es un factor decisivo o sustancial para la revocación de la Resolución emitida por el DACO. Este Tribunal concluye que la admisión del récord de negocio no hubiera variado el resultado del caso. Por tanto, no procede la revocación de la Resolución por este sólo aspecto.

## V

Con relación al segundo error señalado en cuanto a la determinación de que el Mueble 2 adolece de vicios ocultos, por lo que procedía la resolución del contrato, es menester señalar que en el caso de autos la controversia trata sobre la compra de un bien mueble, un juego de cuarto, por lo que aplica en su parte

pertinente, el Código Civil de Puerto Rico relacionado a la compraventa de bienes muebles. Arts. 1334 al 1426 del Código Civil, 31 L.P.R.A. § 3741-3951. En virtud de las referidas disposiciones del Código Civil, recibido el precio, corresponde al vendedor entregar la cosa y asegurar al comprador la posesión pacífica y útil de la misma. Art. 1350 del Código Civil, 31 L.P.R.A. § 3801. El propósito o causa de la venta para el comprador es adquirir la cosa para servirse de ella, y dicho propósito dejaría de realizarse si una vez hecha la entrega el comprador se ve privado de la cosa o imposibilitado de aplicarla a los usos que le son propios. *Ferrer Delgado v. General Motors Corp.*, 100 D.P.R. 246, 254-255 (1971). Por ello, surge la obligación de garantía que tiene el vendedor, la que el Código Civil llama obligación de saneamiento. Art. 1363, 31 L.P.R.A. § 3831.

El artículo 1363, *supra*, dispone que *"[e]l vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida si la hacen impropia para el uso a que se le destina, o si disminuyen de tal modo ese uso que de haberlos conocido el comprador no la habría adquirido, o habría dado menos precio por ella; pero no será responsable de los defectos manifiestos o que estuviesen a la vista, ni tampoco de los que no lo estén, si el comprador es un perito que por razón de su oficio o profesión, debía fácilmente conocerlos."*

Por su parte, el Artículo 1374 de dicho ordenamiento, 31 L.P.R.A. § 3842, establece que *"[e]l vendedor responde al comprador del saneamiento por los vicios o defectos ocultos en la cosa vendida, aunque los ignorase. Esta disposición no regirá cuando se haya estipulado lo contrario, y el vendedor ignorara los vicios o defectos ocultos de lo vendido."* Es decir, en ausencia de una renuncia de que lo vendido no está sujeto al saneamiento, si aparece un vicio oculto, el comprador puede optar, entre otras acciones, por desistir del contrato, abonándosele los gastos que pagó (acción redhibitoria) o rebajar una cantidad proporcional del precio, a juicio de peritos (acción estimatoria o *quanti minoris*). Art. 1375 del Código Civil, 31 L.P.R.A. § 3843; *Márquez v. Torres Campos*, 111 D.P.R. 854, 861-862 (1982).

Ahora bien, los vicios ocultos son aquellos que exceden la medida de las imperfecciones menores que cabe esperar normalmente en un producto determinado. No es necesario que dichos defectos imposibiliten el uso de la cosa vendida, siendo suficiente que merme notablemente su valor. *García Viera v. Ciudad Chevrolet*, 110 D. P.R. 158, 162 (1980); *DACO v. Marcelino Mercury, Inc.*, 105 D.P.R. 80, 84 (1976); *Berríos v. Courtesy Motors of P.R., Inc.*, 91 D.P.R. 441, 445-446 (1964); *Fuentes v. Hull Dobbs Co.*, 88 D.P.R. 562, 569-570 (1963); Artículo 1373 del Código Civil, 31 L.P.R.A. § 3841.

Para que los vicios ocultos obliguen al vendedor a proveer saneamiento, es necesario cumplir con los siguientes requisitos: (1) éstos no deben ser conocidos por el adquirente, (2) el defecto debe ser grave o suficientemente importante para hacer la cosa impropia para el uso a que se le destina o que disminuya de tal modo este uso que, de haberlo conocido el comprador, no lo habría comprado o habría dado menos precio por ella, (3) que sea preexistente a la venta, y (4) que se ejercite la acción en el plazo legal, que es de seis meses contados desde la entrega de la cosa vendida. *Pérez Vélez v. VPH Motors Corp. h/n/c Triangle Chrysler del Oeste; Chrysler International Services, S.A., Etc.*, ___D.P.R.___ (2000), **2000 J.T.S. 177**, a la pág. 378; *Domínguez Talavera v. Caguas Expressway Motors, Inc.* ___D.P.R.___ (1999), **99 J.T.S. 85**, a la pág. 1067; *Ferrer v. General Motors Corp., supra*, a las págs. 256-257.

En resumen, si una vez verificada la entrega, se demuestra el incumplimiento por parte del vendedor de garantizar la plena posesión económica de la cosa vendida, el comprador tiene a su favor una pretensión de redhibición. En todo caso, la rescisión del contrato a que da derecho la acción redhibitoria procede solamente cuando se demuestre que el vendedor, distribuidor o manufacturero, tuvo oportunidad razonable para repararlo, pero no pudo o no quiso corregirlos. *Ford Motor Co. v. Benet*, 106 D.P.R. 232, 238 (1977).

## VI

En casos de saneamiento, le corresponde al comprador probar que el mueble comprado no funciona bien, aunque no es necesario que los defectos imposibiliten el uso de la cosa vendida, siempre que mermen

notablemente su valor y que el vendedor haya tenido la oportunidad de corregir el defecto. Una vez el comprador prueba lo anterior, procede que el vendedor, para poder quedar eximido de responsabilidad, demuestre que: (1) el comprador le dio un uso indebido; (2) que el mueble no tenía defectos de fabricación, y (3) que las reparaciones fueron adecuadas. Véase, por analogía, *Pérez Ríos v. Hull Dobbs,* 107 D.P.R. 834, 842 (1978). De no demostrar la responsabilidad del comprador por el defecto, dicho comprador tiene derecho a que se le reembolse el precio pagado por el mueble y los gastos en que necesariamente incurrió por motivo de los defectos o vicios del mismo.

Al revisar los documentos que obran en autos, junto a las transcripciones presentadas, surge que Maldonado presentó prueba que la mesa de noche del Mueble 2 se le rompió la esquina cuando el chofer de Rooms To Go entregó la misma. Para ello presentó el *"Delivery Exception Report"*, documento del cual se corroboró lo testificado por Maldonado; además, del mismo surge que las gavetas están descuadradas. Maldonado testificó que le indicó al chofer de Rooms To Go que las gavetas del Mueble 2 no son iguales; son gavetas de muebles distintos, que las gavetas de la cómoda cierran de lado y se ve toda la ropa, y que unas piezas pesadas de madera que van en los pilares de la cama están sueltas. Durante la vista, Maldonado indicó que reportó todo esto al chofer y que Rooms To Go *"no ha vuelto más por allí"*. Maldonado señaló que esos muebles no se usan para nada, que tuvo que mudarse de cuarto y que *"bajo ninguna circunstancia quiero los muebles."* Por su parte, Rooms To Go contra-interrogó y presentó testimonio indicando que Maldonado no le brindó la oportunidad de corregir los defectos de Mueble 2 y que no fueron notificados de éstos. Para ello presentó prueba de las gestiones realizadas con Mueble 1 y testimonio indicativo de que Maldonado no se había comunicado con ellos, que lo único era la comunicación con el chofer. Sin embargo, Rooms To Go, a pesar de que surge del informe del chofer el problema con la mesa de noche y con las gavetas, no presentó prueba alguna sobre las gestiones que hiciera para reparar las mismas. Ciertamente, Rooms To Go tenía conocimiento a través del documento de entrega de por lo menos algunos de los problemas con Mueble 2; no obstante, no se comunicó con Maldonado para arreglar los mismos, a pesar de que Maldonado informó los mismos.

Así las cosas, quedó establecido que el Mueble 2 tiene desperfectos, que fueron notificados al empleado de Rooms To Go cuando fue entregada la mercancía y que luego de ello nada se hizo. El testimonio de Maldonado le mereció al DACO entera credibilidad, por lo que determinó que:

*"Conforme a lo antes expuesto y el derecho aplicable, concluimos que en el presente caso están presentes todos los requisitos necesarios para que proceda la acción redhibitoria. Este Departamento no tiene dudas que los muebles que Rooms To Go le vendió al querellante adolecen de defectos y vicios ocultos. Procede recalcar que estos defectos y vicios se dieron con los dos conjuntos de muebles que Rooms To Go vendió a los querellantes y que éstos eran muebles destinados para la habitación de los querellantes."*

El DACO ordenó a Rooms To Go reembolsar a Maldonado las sumas pagadas por los dos conjuntos de muebles y su entrega, cantidad ascendente a $4,149.95, más la cantidad de $2,000.00, en concepto de daños y perjuicios y angustias mentales, más $1,000.00 en concepto de honorarios de abogado. A su vez, ordenó a Rooms To Go coordinar el recogido de los muebles objeto de la querella.

Este Tribunal concluye que, de la prueba presentada ante el DACO, existe evidencia sustancial en el expediente para sostener la determinación del DACO en cuanto a que procede el saneamiento. La determinación del DACO está sustentada en la deferencia concedida a la prueba testifical, en una base racional y la misma no resulta arbitraria o irrazonable. Rooms To Go no demostró que existe otra prueba en el récord que menoscabe el valor probatorio de la evidencia impugnada. Ante los hechos particulares de este caso, la determinación de la agencia es razonable de acuerdo a la totalidad de la prueba que tuvo ante su consideración, por lo que el error señalado no fue cometido.

## VII

Por último, Rooms To Go nos señaló que erró el DACO al valorizar los daños. No le asiste la razón.

Rooms To Go sostiene que aplica la doctrina de mitigación de daños y que el hecho de que Maldonado no reclamara directamente a Rooms To Go por los desperfectos del Mueble 2 tuvo la consecuencia obvia de retrasar cualquier acción que pudieran haber tomado sobre la reparación o sustitución del referido inmueble. Además, indicó que los daños emocionales y angustias mentales alegadamente sufridos por los querellantes, si alguno, fueron ocasionados por la falta de diligencia y el desinterés mostrado en obtener una rápida solución al presente caso.

La doctrina de mitigación de daños postula el deber que tiene una persona que sufre perjuicios de adoptar aquellas medidas razonables y a su alcance tendentes a reducir el monto de los mismos. *Odriozola v. S. Cosmetics Dist. Corp.,* 116 D.P.R. 485, 508 (1985); *Fresh-O Baking Co. v. Molinos de P.R.,* 103 D.P.R. 509, 520 (1975); *Cía. de Fomento Industrial v. León,* 99 D.P.R. 633, 646-647 (1971). *"Al igual que otras normas de derecho, su virtualidad y extensión hay que evaluarla a la luz de las circunstancias particulares de cada caso, no existiendo fórmula mágica ni matemática que permita aplicarla con facilidad." Fresh-O-Baking Co. v. Molinos de P.R., supra,* a la pág. 521.

Surge del expediente ante nuestra consideración que Maldonado informó inmediatamente a un empleado de Rooms To Go sobre el problema con el Mueble 2; además, decidió no usar los muebles para evitar su deterioro. De la prueba se desprende que Maldonado tomó las medidas razonables disponibles a su haber, por lo que no incumplió con su deber de mitigar los daños. A su vez, en el récord no existe prueba de que Rooms To Go, luego de presentarse la querella ante el DACO, hubiese hecho una oferta de sentencia para cambiar o recoger los muebles y devolver lo pagado. Ante los hechos del caso, el DACO actuó dentro de lo permitido por ley al conceder daños y honorarios.

## VIII

Por los fundamentos antes esbozados, se expide el auto y se confirma la Resolución emitida por el DACO.

Lo acuerda y manda este Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIO 2003 DTA 90

**1.** Para la compra del Mueble 2, Rooms To Go acreditó la suma de $2,059.96 que corresponden a los $2,969.93 pagados por Mueble 1, menos $535.45 del *"King Mattress"* que no fue devuelto, $264.54 del *"boxspring"* que no fue devuelto, $49.99 por el tratamiento en el *"King Mattress"* y $59.99 pagado por la entrega.